Good afternoon, Your Honors. May it please the Court, my name is Russell Brooks. I represent the appellants, Oregon Trollers, and others. I'd like to reserve five minutes of my time for rebuttal. Okay, please keep track and we'll try to help you. This appeal involves an issue of an agency acting outside of its authority to approve an unlawful Chinook harvest regulation that devastates fishermen. This Court can and should review the agency's approval of the regulation, because the fisherman challenged the agency's action within the Magnuson Act's 30-day statute of limitations. When the Court reviews the agency's action, it should overturn approval of the regulation for three reasons that I'll discuss today. First, the harvest regulation NIPS approved is inconsistent with the Magnuson Act's definition of a fishery and a stock. Second, in approving the regulation, NIPS failed to consider the economic impact and human safety issues surrounding the regulation. Instead, the agency simply deferred to the Pacific Fisheries Management Council's data, which was void of any meaningful analysis. And then finally, NIPS's reasons for exempting its regulation from the APA's important processes is inconsistent with this Court's prior precedent. NIPS approved the 2005 harvest regulation on May 4, 2005. That regulation devastated the fishermen and caused them injury. As a result, less than 30 days later, the fishermen challenged that regulation. Accordingly, under Section 1855F1, jurisdiction exists over the fishermen's claims. Now, the agency claims that the fishermen actually challenged a 1989 amendment to the fishery management plan. That's simply not the case at all. It's the 2005 harvest regulation that harmed the fishermen, and that is the regulation. And NIPS's approval of that regulation that they challenged. Well, how could they do otherwise unless they changed the management plan? Excuse me, Your Honor? How could they do otherwise unless they changed the management plan? Well, the management plan's in place. If they don't change it, they have to follow it. The management plan has been in place since 1989. All right. They have to follow it, do they not? They do not have to follow it, no, Your Honor. What do you mean they don't? Of course they have to follow it unless they amend it. It is simply a management goal, an objective. It tells them what to do. The agency does point out that it can only be changed by amendment. However, by pointing that out, that's a bit misleading because it avoids the fact that it does not have to be actually applied every year. Either the council can recommend to NIPS that it not be applied, or NIPS, of its own accord, can simply not apply this management objective. Really? Exactly, Your Honor. You got examples of it? They just ignore the management plan? Your Honor, I can point to the 1989 fishery regulation in place, May of 1989, in which the escapement spawner rate was lowered from 35% to between 33% and 34%. And that was right after this 1989 amendment was enacted. And they did it without amending the plan. They did it without amending the plan. And if you look at the 1989 amendment regulation itself, this point was brought up by public comment, that there were concerns that this could only be done away with by amendment. And NIPS itself pointed out that that's not true. It can be done away that way, but there are also two other instances in which the management objective may not apply in a given year. And that's by the council recommending that it not apply after the salmon technical team confers with the council, basically, and approves that decision, or even without council action. NIPS, of its own accord, can decide that the objective will not apply this year. It certainly can. I had an impression that it had a much more permanent status than you could have. Well, it's permanent in the sense that it cannot be removed from the fishery management plan except by amendment. But as far as actual annual application, it does not necessarily have to apply every year. Well, it's pretty ineffective that if it's up to them every year whether to apply. I mean, it's a framework. And you say the framework can be altered every year at the option of the council. Well, it's exactly that. It's a framework, and it's a goal, an objective. It's hardly set in stone. Now, furthermore, even when it does apply, it does not always work to the detriment of the fishermen. You can go back from 2005, the regulation challenge, back to at least 1999, and it did not operate to cause the fishermen harm. But there were times when it did harm them, did it not? It certainly harmed them in 2005, Your Honor. No, before that. Excuse me? Before then, before that date, it did harm them. I can't speak to that, Your Honor. I'm representing my clients. I'm here today over the 2005 regulation. You're not aware of another year when it harmed them? Certainly I'm aware that the agency contends that it reduced the harvest, and that may indeed be the case. Well, are you disputing it? Excuse me? Are you disputing it? I mean, what basis do you have to dispute that? I mean, it is quite crucial. It earlier had an impact on your clients, and they did nothing about it. Your Honor, those regulations and those fishermen are not before this Court. I don't know if they were harmed or not. There are many factors at play other than this management. Just a minute. That regulation is the same regulation and is before this Court, the one that constitutes the framework. And the impact is on fishermen, so I don't know whether they're identical with your fishermen or not. Your Honor, the fishermen contend that the 1989 amendment is not before this Court. They didn't challenge that amendment. They challenged NMF's approval of the 2005 regulation. Now, even for the sake of argument, contending that the fishermen did challenge this management objective, jurisdiction would still exist over this case by virtue of subsection F2 of section 1855. In fact, Congress amended the Magnuson-Stevens Fisheries Act in response to an argument, a case, very similar to what the agency has raised. That was, of course, the Kramer v. Mosbacher case. There, the Fourth Circuit affirmed dismissal of a challenge based under the Magnuson Act. The Fourth Circuit held that the parties in that case were just simply challenging an amendment to a fisheries management plan that had taken place years before. In response to that case, Congress amended the Magnuson Act, so that not only can parties challenge a regulation or a fishery management plan, but they can also challenge actions taken that implement that fishery management plan or that regulation. Now, here, the action challenged is NMF's promulgation and approval of this particular 2005 harvest regulation. So, therefore, even for the sake of argument, if NMF is correct, that the fishermen are really just challenging the 16-year-old management objective, jurisdiction still exists in this case. Assume for the moment that we agree with your argument that the statute of limitations has not run and that it is available to your clients to challenge this 35,000 natural spawners goal. Why is that goal incorrect? Your Honor, the Magnuson Act defines a fishery as one or more stocks of fish that are treated as a unit. Now, the stocks of fish at issue in this case. And, I'm going to lose track of my initials. They're treating the natural spawners and the non-natural spawners as two different groups. Why is that not the end of the argument, and you lose? There is no support for them doing that. First, the Magnuson Act doesn't allow them to do that. They treat a fishery and a stock as a unit. Here they're treating members of the fishery and the stock as subunits, in effect as two fisheries or two stocks. That violates the Magnuson Act. Fisheries and stocks must be treated and managed as a unit. But the definitional structure of the Magnuson Act doesn't compel the reading that you give. At least as I read the words, they're much more vague or general than that. I would assume that the agency has the power, at least as I read the Act, to add its own definition consistent with the statutory language. Well, Your Honor, I believe the language, the definition of fishery and stock is clear. The fish must be treated as a unit. They cannot be treated as two separate units. But moreover, even if those definitions were ambiguous, and the national standards two and three were ambiguous, then at that point you look at the agency's interpretation of the language. And here they have simply offered no support whatsoever for not treating natural spawners and hatchery spawners together equally as a unit. There's no scientific support. All the agency has said is that, well, this is reasonable. Well, that's a hollow assertion. And there's no reasoned analysis. They're not connecting the dots. They're not providing any scientific support. There's none in the record. There's none in their briefs. And on that basis, the agency's regulation can't be upheld. What is the definition, if it has one, in the Magnuson Act of a stock of fish? Of what fish? A stock of fish. A stock of fish is a species, subspecies, geographical grouping, or other category of fish managed as a unit. Not managed. Capable of management. Capable of being managed as a unit. So isn't our natural spawners capable of management as a unit? But, Your Honor, at each step of the process, they are managed as a unit. They only have one harvest for both naturally spawning and hatchery spawning fish. The only time that they treat them separately is when they count them as they return or escape the ocean harvest to the Klamath River. At that point, they treat them separately. Doesn't that meet the definition? They're capable of being treated separately. No, it says capable of being managed as a unit. And they manage them as a unit every step of the process except that step. And they provide no justification, no basis, no reasoned analysis for doing that. No, but the statute gives the agency that power to decide what's capable of being managed separately. Well, Your Honor, I believe that's inconsistent with the statutory language and the statutory purpose. For one thing, the agency has provided no purpose for what they're doing other than its reason. Can you cite any authority that agrees with your interpretation of what stock means? What do you rely on? I rely on the language of the management act itself. That's all. You don't have any cases or any authority to back you up? Other than the act itself, no, Your Honor. So, in other words, it comes down to a reading of the act. Yes, Your Honor. And if the reading of the agency is a reasonable one, although maybe not the only one, aren't we bound by that? But that's just it, Your Honor. It's not a reasonable interpretation. So our task then is to determine whether or not the agency's reading is reasonable or unreasonable. That is your task, Your Honor. That's as far as we go. It's not whether we could come up with a better one. Certainly their interpretation has to be consistent with the act, you know, reasonable and consistent with the act. And we contend that it's neither. They've offered no justification. And it does conflict with the act itself. Now, I should add that, of course, there is a case interpreting a similar provision of the Endangered Species Act, Alcee Valley Alliance v. Evans. And even though it's a different environmental statute, the circumstances and the terms are similar. And there the District of Oregon held that when the agency itself defines a group, a population of fish, to include certain members, then from that point forward, all of those members must be treated equally. Now here, that's what they've done with the Magnuson Act. The Pacific Chinook Fishery and the Klamath River Chinook Stock includes both naturally spawning Chinook and hatchery spawned Chinook. When they include all of those members by their own accord in that stock and in that fishery, then they have to be treated the same from that point on. They can't unnecessarily restrict the harvest causing devastating harm for some purpose which they can't provide this court. Now, was Judge Hogan's decision in the Endangered Species Act case appealed to us? It was, Your Honor. The court did not reach the merits. They affirmed on jurisdictional grounds. Or not affirmed, but they dismissed the case on jurisdictional grounds. Okay. So we've not ruled on that question? This court has not ruled on that question, no. And I heard you say quite clearly and correctly, but it is a different statute. It is a different statute. Of course, it's very analogous, and we contend that it does apply to this case. Just point out your time and how much you wish to say. Yes, Your Honor. I see that, and I'll reserve the remainder of my time for rebuttal. Thank you. Thank you. May I please the court? I'm Mark Haag from the Department of Justice for the Federal Attorneys. With me in the courtroom are Eileen Cooney, Miriam McCall from NIMPS, and Chuck Tracy from the Pacific Fishery Management Council. Also at counsel table are Scott Williams, who represents the Intervenor Yurok Tribe, and Rob Roy Smith, representing the Intervenor Hooper Valley Tribe. I'm going to take 15 minutes of the appellee's time. Mr. Williams will take five minutes. Okay. I'd task him with standing up and tugging on your coat. I'm sure he will. I'd like to address three issues, the statute of limitations, the merits of the Trawler's Magnuson Act claims, and NIMPS' invocation of the good cause exception to the APA's notice provisions. The statute of limitations argument here I think is fairly straightforward. The statute of limitations for challenges to regulations promulgated under the Magnuson Act is 30 days. This Court has upheld that, has applied and upheld that limitation in Norbert Fisheries, recently reaffirmed that holding in Turtle Island Restoration Network. But Turtle Island really doesn't involve the question as we have it here, does it? Well, it's... Turtle Island involved suits under other statutes that the Court says, yeah, but what you're really doing is suing under the Magnuson Act. There was not a question as to what the Ed Magnuson Act meant. That's correct. And here the question is, what does the Magnuson Act mean? What's within the scope of the challenge? Can you get back to the 89 escapement plan? But I think Turtle Island is relevant to that point, Your Honor, because Turtle Island says just because a plaintiff characterizes something as a challenge under NEPA or a challenge under, I believe it was the Endangered Species Act, if in fact the substance of the challenge is a challenge to a fisheries regulation, then that Magnuson Act 30-day statute of limitations applies. Of course. That's exactly what it says. And that's exactly what's going on here. The United States... Well, it applies, but then the question is, how does it apply? Let me ask you. It seems to me the strongest argument that patrollers have against your position is the overruling of the Cramer case by the subsequent amendment. How do you respond? The amendment was in 1990, correct? And it adds the ability to seek judicial review of agency actions as well as regulations. But the statute of limitations is still 30 days. Norberg was decided after the act was amended in 1997 and makes this distinction very clear between a challenge to the permit, which was timely and was allowed and was disposed of on the merits, and a challenge to the regulation, the overall regulatory scheme setting up the permit system, which the fishermen in that case had also sought to challenge, and the court said no, that's off, that's barred by the statute of limitations. The fact that Congress amended the statute to allow challenges to actions as well as regulations means that if, for instance, in this case, the secretary had closed the fishery through an order that wasn't a regulation, the fishermen would be able to seek judicial review of that order. But it doesn't answer the question or change the analysis of whether the challenge to the order allows the fishermen to go back and get at the 15-year-old fishery management plan. The proper way to do that, as in the context of all longstanding regulatory schemes, if a member of the regulated community wants to challenge it, they can petition the agency for an amendment to the regulation. If the agency denies that petition, they can seek judicial review. But they can't use each action implementing the regulation as a way to get back at the underlying framework or the statute of limitations becomes meaningless. But it seems to me that Cramer goes against what you just said. I understand that in Cramer it was a fairly short time period between the initial promulgation and the action implementing it. But this wasn't 1989, sometime in the 2000s. It was all within a calendar year. But nonetheless, it was past 30 days. Right. And the court says, well, sorry, it's past 30 days, even though you're challenging the implementation of it, you can't get at the underlying regulation. Congress amends to overturn that result without saying that in any event, for example, any challenge to the underlying regulation must be brought within a year or two years or three years at that time. It simply doesn't put that time limitation on it. Right. But they also don't say, and the limitation on regulations doesn't apply. The plain language of the bar on challenges to regulations remains in effect. But what Cramer accomplished is, if it would be to allow them to challenge the order at the time it's implemented, just as here, the fishermen can — we are not saying that the fishermen's claim is entirely barred. It's only to the extent that they seek to challenge the underlying regulation. So they can — But you're saying they're just out of luck if they wish to bring a direct judicial challenge to the 89-35,000 escapement goal unless they do that within 30 days of the promulgation of that regulation, period. That's your position, correct? No. Well, it is — they're barred by the statute of limitations from getting direct judicial review. Instead, they have the option of petitioning the counsel or the agency to amend the regulation and then seeking judicial review at that point if the agency doesn't do what they asked them to do. But, of course, seeking review of failure to amend is very different from seeking review of the regulation itself. That's right. That is. So, I mean, that's a different — that's a very different case on the merits. Well, in this context, I'm not sure that it is that different because they're bringing a facial challenge. They're not saying that this — that their — that the distinction is arbitrary and capricious, although Mr. Brooks spoke about that a bit just now. The gist of their argument is this is unlawful. So if they petition the agency and say your fishery plan includes an unlawful provision, it's barred by the plain language of the statute, and the agency denies that, and they get review of that, that's a fairly — What's the harm, as a practical matter, of reading the 1990 amendment the way the Oregon Trollers would read it? Why is that — does that turn into an unmanageable system or not? I'm sorry? Does that turn it into an unmanageable system of judicial review or not? I believe it does, Your Honor. Because? And it's inconsistent with the statute. It's unmanageable because? Because of the time frames that the — that the Act establishes. Say more what you mean. I don't understand yet. The court in Turtle Island talks about this. The Magnuson Act establishes a fairly comprehensive process for the fishery councils to develop the regulations, lots of public comment, lots of public input, and then a very short window for judicial review because of the need to get regulations in place quickly and to have certainty about the regulations. And therefore? And therefore, allowing someone to come in 15 years after the fact, 17 years after the fact, and challenge the framework upsets that whole process. I don't understand why that's necessarily so. That is to say, what you're saying is they can bring the challenge to the implementing action so long as they bring that challenge within 30 days. So they're able to do that. Right.  Why does that make it such a more complicated case that it doesn't then can't be fairly expeditiously resolved? Well, I think this is — At least I think that's your argument, that that makes the case too complicated. It's not just that. That's because that's not what Congress provided for in the statute is our first argument. Yeah, but what if I disagree with you or what if I think, you know, I'm not so sure. Let me understand the policies behind it. But the — one of the policies behind it. You heard Mr. Brooks talking about how there's nothing in the record here to explain why the agency chose to distinguish between natural spawners and hatchery fish. Well, the record for that decision — that decision was made 16 years ago, 17 years ago. The record for that decision is 17 years old. The record for that decision is not before the court. For the agency to have to, every year when it sets the seasons, the days that fishing is going to be allowed, to also reinvent the entire regulatory scheme. What about Mr. Brooks' argument that — I forgot what year he mentioned, but in at least one year the annual plan actually set the limit or the cap — is it the limit? The minimum amount of the natural spawners below what's in the plan. Well, there are two elements to the natural spawner escapement goal that's in the fishery plan. And this is at supplemental excerpts of record. It's tab 12, page 259. 12 what? It's SER 259. Yeah, tab 12, what page? 259. 259, okay, go ahead. The escapement goal includes a rate. Initially it was 35% of natural — 35% of adults must escape to spawn in natural areas, plus a minimum. 35% or 35,000 natural spawners, whichever is greater. Mr. Brooks said, well, the agency changed that 35% to 34%. But at page 259 in the supplemental excerpt, the fishery plan explains that the percentage, the rate, may be changed by action of the salmon technical team. And that was how it was changed, through a formal analysis and finding by the salmon technical team. Whereas the floor, the 35,000 natural spawner escapement floor, can be changed only through an emergency rule or amendment to the fishery plan. So the process is not as casual as he indicated it was. No, absolutely not. The fishery plan makes very clear that this is a firm limit and that extraordinary measures are necessary to depart from this limit. This has been in effect every year since 1989. It hasn't been the controlling limit on the harvest every year, because different stocks go up and down, and sometimes the need to protect a different stock means that the limit is set lower than would otherwise be required here. But it has been in effect every year. And we cite in our briefs, the Federal Register notices for multiple seasons, I believe it's, we cite 1989, 1991 through 95, 97, 98, 99, 2000, and 2004. In all of those years, the natural spawner escapement provision, either the rate or the floor, was determinative. That was what set the limits for how many, for what the ocean harvest of salmon was meant to be. You made what seemed to me an interesting and good point as to why the 35,000 natural spawners goal should be challenged within 30 days of that being established as the goal, saying, well, if you wait 15 or more years to challenge that in the process of challenging an implementation, you're not going to have the scientific evidence in the record once you're doing the implementation decision, because that 35,000 was established in the earlier proceeding. Which makes good sense to me. But if it's available to challenge the 35,000 natural spawners escapement goal in the implementation, what's to prevent the agency in defending that from bringing forward the record that underlies the 1989 decision? Well, there's nothing. And I don't want the Court to get the suggestion that we think that there's no evidence in the record to support this, because there is evidence. There are a few studies that were the basis. But first answer my question. What's to prevent you from bringing in as a defense to the 35,000 number whatever scientific evidence was in the record in support of the 89 decision at the time of the 89 action? Anything? Well, I'm not the... You don't destroy the records. It's there, isn't it? The records are there. I guess the decision that is nominally being challenged here, the 2005 Harvest Reg, is based on an administrative record. The trawlers did not participate in the administrative process leading up to this regulation in a way that raised this issue of the distinction between natural spawners and hatchery fish. So once they filed their complaint, then the agency's got the record that was before it at the time it made this decision. So in other words, there's no record to speak of. A record wasn't developed because the issue wasn't raised. Is that what you're saying? Yes, in part. And again, there is some record, and we cite in our brief, and I can refer the Court to the portions of the record that go back to 1989. There's also a 1999 study when the agency re-evaluated the merits of this distinction between hatchery fish and natural spawners. So there is some record there, but it's not as extensive as the record that was before the agency in 1989. But, you see, if somebody like the plaintiffs are permitted to challenge the natural spawner's escapement provision annually, and they did it this year, why couldn't you make a record this year? As to the reason for the distinction between natural spawners and hatchery fish. I guess what begins to happen then is every time somebody turns 18, every time somebody buys a fishing boat, every time somebody decides to get into the fishery, the agency has to re-litigate the validity of the whole framework. Now, just to make sure that Mr. Williams is not... I'm sorry. You have five minutes. We're pursuing a question that seems somewhat interesting. Whatever happens, you've got five minutes. Okay, so don't be anxious. Five minutes is safe. But that doesn't necessarily follow that just because it can be challenged outside the 30-day period after the 35,000 regulation is put into place, that it's always in play. That is to say, let's say that we... This is now purely hypothetical, but let's say in this case, we say the statute of limitations does not bar the challenge to the 35,000 fish natural spawners escapement, and we uphold it on the merits. Somebody comes along next year, brings the same challenge to the 35,000. Well, if it's the same group, of course, they're going to be bound by some form of estoppel. If it's a different group, they're not going to be bound by estoppel, but they're probably going to be bound by some form of stare decisis. I mean, the question is likely, once we've decided it, it's settled. So what's the problem? Well, I guess the problem, there are two problems. The first is that that's not what the language of the statute says, and that's not what Norbert says. And then the second problem is that then everybody gets two bites of the apple. You only get, instead of one bite... No, it's just they delay the bite. Excuse me? They delay the bite. No, they only get one. And then once we decide it, game's over, it's decided. But they don't want to... At least as I read Cramer, Cramer doesn't force them to challenge the regulation within 30 days of the regulation. Now, you might say, and I think quite properly, but Cramer, the realistic thing was it was all within less than a year. I think it was less than six months. And here we've got 1989, and we're litigating this in 2006. I mean, clearly the statute couldn't have meant that. But there's nothing in the statute that talks about in any event no later than three years. There's nothing, I mean... Well, but I don't see why you would need an in any event no later than three years. The statute says you can challenge a regulation or an action within 30 days of the regulation. If we're going to overrule Cramer, challenging the action has to be read as allowing the challenge to the underlying regulation upon which the action is based. That's the whole point of overruling Cramer. Well, I don't think that that's what... Because what... In Cramer, they were not allowed to challenge the implementation of the regulation, the implementation at all, because the regulation, the implementation was done by an order, not by a regulation. So if the fishery management plan or the limits are set in May, and then in September the secretary issues an order, I'm not sure, a few months later, but after the 30 days, the secretary issues an order that says the fishery is now closed. What the amendment, what the addition of Section 1855F2 allows the plaintiffs to do in that case is to come in and say, this closure order is wrong because the facts don't support it or the record doesn't support it. Without... Could they have challenged the closing? Could they have challenged the order closing it without challenging the regulation? I think that's what's... Right. And I think the answer is, yes, they can, because they can say, you have closed the fishery on the basis of a thousand fish have been caught and that was the limit you set. And, in fact, the record shows that only a hundred fish have been caught. So they can challenge the implementation, the basis for issuing the order, but they can't go back and challenge the determination that's been made previously, that when the fishery reaches a thousand fish or whatever the limit was, we're going to close it. Thank you. Thank you. Thank you, Your Honor. I'm Scott Williams. I represent the Yurok Tribe. I want to respond to some of the Court's questions just now, but first I'd like to explain to you why we're here. The Yurok Tribe has lived since time immemorial on the Klamath River. The Klamath River is the heart of the reservation for the Yurok people, in every sense of the word, including literally. It is... The reservation is one mile on either side of the Klamath River, from the mouth of the Pacific Ocean, 45 miles upriver to where it meets the reservation of the Levali Tribe. To the extent that ocean trawlers catch fish that would otherwise get to the Klamath River, those fish will not make it to the Klamath River. The Yurok people will go without fish. It is absolutely impossible for me to overstate the importance of fish to Yurok people. There are cultural aspects to this. There are subsistence aspects to this. There are historical traditions. There was a commercial fishery on the Klamath River until about 1934, when it went away. What has happened in this case up until now, is that the plaintiffs below have ignored what is the third prong of a three-legged stool. They have ignored the presence of the Levali Tribe and the Yurok Tribe. They have ignored the federally reserved fishing rights of those people, which this court confirmed in 1986 in Eberhardt, and which this court confirmed most recently in Paravano in 1995. They have ignored the obligation of the agency, whose lawyer you just heard from, the obligation of that agency to protect the ability of the Yurok and Hoopoe Valley people to depend on fish, as they have since the beginning of time. In Paravano v. Mastin, a case which the Oregon courts have not cited, this court established, perhaps not for the first time, in 1986 in Eberhardt, Judge Buser wrote a concurring opinion which paved the way, we think. What the court held in Paravano in 1995 was that the agency's obligation to protect the fishing rights of the Indian people on the Klamath River was so important that it justified a closure of the ocean fishery in 1993. What the court went on to say is that if there is any doubt about the meaning of the statute, if there is any concern about the agency's decision, to use this court's words, substantial deference is due the agency based on its obligation as a trustee to protect the fishery resources of the Indian people. That's why we're here. In turning to the court's questions about the statute of limitations, I returned to Judge Noonan's comment earlier. As we see it, the fishery management plan was designed to be a foundational document subject to change on an annual basis, modification on an annual basis, to adjust for current circumstances. There are two ways in which one could challenge a fundamental principle of that plan. One would be to do so within 30 days after that regulation was adopted. The second would be to do it within 30 days after that regulation was applied to you. What we have demonstrated, what the federal government has demonstrated, is that this fishery management plan, this foundational document, was applied to the plaintiffs, the appellants in this case, on an annual basis beginning in 1989. And our point, and I think this goes to Judge Fletcher's comment, is that it would render the concept of a statute of limitations meaningless were it to be allowed for someone to wait year after year after year to choose their time to challenge a regulation. Let me make sure I understand your argument. Let's say that in 1989 the 35,000 fish number is established. Six months go by, rather than 30 days, six months go by, and an implementation of that with a fish enclosure is imposed. And at that point our controllers or another group of fishermen challenge that implementation under your theory. This is the first time it's been applied to them. Under your theory, can they challenge the 35,000 figure? In my opinion, yes, sir. Then why is this case different? Because we're outside the 30 days. Correct. And I think that answer, it seems to me, gives it away. So why doesn't it give it away? Because the way we read the amendment, which followed the Kramer v. Mosbacher case, what Congress intended to do was to allow fishers to challenge a regulation once they have learned that that regulation is being applied to them, once it affects them. If they act within 30 days of that time period, Congress says that's okay. But there's nothing in the statutory language that says they have to do it the first time it's applied to them. I agree with you. There isn't. But as the federal government pointed out in its brief on pages 31 and 32, this entire statute is designed to quickly come up with these annual modifications, quickly address any responses to them, quickly resolve any disputes about it. No preliminary injunctive relief is permitted in these cases. The courts, including this court, Congress said expedite these hearings. 30-day statute of limitations. Everything is designed to do this quickly. Get it done. Get it over with. Thank you. Okay. Thank you. You've saved some time for rebuttal. Thank you, Your Honor. Starting with the Norbird case, I would just simply point out that section or subsection F2 was not at issue in that case simply because it was much more clear. There, as far as a substantive challenge to the regulation concerning whether the plaintiffs had notice or whether it affected a taking of their rights, that complaint was filed well outside the 30-day statute of limitations. There is no dispute here that a 30-day statute of limitations applies, be it a challenge to a regulation or an action. We just simply fall within that 30-day statute of limitations, and that doesn't eviscerate the 30-day statute. It's true that there is a quick timeline under the Magnuson Act, but that also applies to challenges brought under the Magnuson Act. What do you make, though? How is your response, though, to the argument made by the government that if you don't challenge the $35,000 fish number until well into the 2000s, when that number was established in 1989, no surprise the administrative record for the action that you're actually challenged will not contain a great deal of scientific justification for that number because that decision was made in 1989? Well, Your Honor, they are approving a regulation that's based on that requirement. No, they're building an implementation upon that regulation previously promulgated. Right. They're approving a regulation that implements that circumstance. No, they're not approving it. They're not revisiting it. They're leaving it alone, and they're basing their current implementation upon it. Well, exactly. Their current implementation based on current circumstances that exist or existed in 2000. In fact, we can only assume that they have record support for that approval at each step of the process. They issue regulations almost every day. But part of what your lawsuit is about, you're complaining that they don't have any scientific support in this record of this decision upholding the 1989 decision. But, of course, the proper place to look for the scientific support of that would have been in the administrative record leading up to the 89 decision. Isn't that right? We're focused, respectfully, Your Honor, we're focused on their approval of this regulation. I understand. What they did this year. But I'm asking you to respond to his point, which I thought was a good one, which is to say if you're going to play fair with the court in the sense of putting in front of the court all the considerations that the agency had when it arrived at the 35,000 fish number, the number you think they could and shouldn't have done, well, why don't we have the record that actually led them to arrive at that number? That's the record that was compiled in 1989. And you're saying, well, they don't have the record here for 2005. Well, of course they don't because they made the decision back then. Well, they relied on that decision in 2005. Of course they did. They implemented that decision. But they don't have to redo it every time in terms of having more scientific testimony. I don't necessarily think they have to redo or reconstruct the entire record, but they do have to provide some sort of justification in the record for what they're doing this year, how they're doing it, what they're relying on. They have to show their work. They can't just simply say, well, we did this 16 years ago. Why has it been challenged since then? They've created a framework, which has meant the loss. And they've got the record back in 1989. As Judge Fletcher says, why shouldn't that be part of what you have to contend with? If they didn't put it in the administrative record for this case, then as far as I'm concerned, that's their problem. They should have. If they can't provide support, then this court should not uphold their regulation because there's no support. You know, I would go back to a previous point that was made. In 1989, their regulation apparently didn't cause any harm. And one reason is because they lowered the required ocean escapement rate. The reason why they did that was because there were almost 100,000 Chinook returning to spawn. It's no wonder there was no harm. Now, without harm, you can't have a suit. So if they could not have sued in 1989, when could they sue? Under their reasoning, there could never be a suit. There could only be a petition to amend. And that's their argument. Well, that argument flies in the face of the Magnuson Act and flies in the face of Section 1855F, which provides for judicial review. Quickly, wrapping up here, again, there should be something in the record supporting the distinction between those Chinook that will naturally spawn and those that will be collected by hatcheries. Now, they claim that it's for the reproductive health and, therefore, it's reasonable. But, again, there is no showing of a reasoned analysis. Thank you, Your Honor. Thank both sides for a helpful and extensive argument on a tricky point and an interesting and important case. The case of Oregon Trawlers Association v. Gutierrez is now submitted for decision. That concludes the calendar for this afternoon. We will reconvene tomorrow morning, but I suspect without you.
judges: Noonan, Tashima, W. Fletcher